WESTERN ELECTRIC COMPANY, INC. *v.*
GRAHAM D. ENGLEMAN

[No. 160, September Term, 1971.]

*Decided November 12, 1971.*

The cause was argued before MORTON, ORTH and CARTER, JJ.

*Paul V. Niemeyer,* with whom was *Jesse Slingluff* on the brief, for appellant.

*William R. Hymes,* with whom was *William R. Levasseur* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The only issue in this case is whether Western Electric Co., Inc., (Western) self-insured employer, shall pay compensation for the disability of its employee, Graham D. Engleman, as provided by the Workmen's Compensation Act. Western admits that Engleman's disability resulted from an accidental personal injury sustained by him but denies that the injury arose out of and in the course of his employment. Code, Art. 101, §§ 15 and 67 (6). The Workmen's Compensation Commission found that Engleman's injury did arise out of and in the course of his employment. On review the Superior Court of Bal-

timore City, sitting without a jury, confirmed the decision of the Commission and a judgment absolute was entered in favor of Engleman for costs.[1] Western appealed to this Court from the judgment. Code, Art. 101, § 56 (a).

How the personal injury sustained by Engleman occurred is not disputed. He was coming from the place where he worked in a car driven by a fellow employee of Western, Charles David Clarke. The car was involved in an accident on the Harbor Tunnel Freeway and Engleman was injured.

The general rule is that employees who suffer injuries in going to or returning from their places of work are excluded from the benefits of the Act; the hazards they encounter on such trips are ordinarily not incidents to the employer's business. *Salomon v. Springfield Hospital,* 250 Md. 150. However, several exceptions to this general rule have been recognized. *Stoskin v. Board of Education of Montgomery County,* 11 Md. App. 355, 357. The one here pertinent is "where the employer furnishes the employee free transportation to and from his work as an incident to the employment." *Watson v. Grimm,* 200 Md. 461, 467. In such cases, the making of the journey is part of the service for which the employee is compensated. *Tavel v. Bechtel Corporation,* 242 Md. 299, 304. Thus the determination of the issue before us depends on whether or not Western furnished Engleman transportation to and from his work within the contemplation of the exception. The issue in the case before us is one of law. "Where the terms and manner of employment are disputed and different inferences may be drawn therefrom, the issue is a mixed question of law and fact, to be determined by the trier of the facts, * * * but where the essential terms and manner of employment are undisputed, the question is one of law for the court." Id., at 303. The essential terms and manner of Engleman's employment are undisputed.

---

1. The case was submitted to the Superior Court of Baltimore City on the record before the Commission.

Engleman was employed by Western as an installer. The terms and manner of his employment were governed by an agreement, contract CWA-11, between Western and the Communications Workers of America. He received an hourly wage based on his period of service as an installer. He also was paid a "daily transportation expense allowance" and a "daily travel time allowance." We must ascertain the nature of these two allowances.

The provisions of Article 13 of the contract are relevant to our inquiry. Certain cities are designated in the contract as "base locations" because they are focal points for the performance of installation work. ¶¶ 1.1 and 1.2. The company designates a base location for each employee, ¶ 2.2, and Western designated Baltimore City as Engleman's base location as he lived there.[2] An installer may have to perform his duties for an appreciable period of time at a job location some distance from his base location. If Western determines that this job location is within range of travel on a daily basis from the computation point of the base location (in Baltimore the computation point is the intersection of U. S. route 40 and Maryland Route 20, that is Orleans and St. Paul Streets),[3] it may place the installer on "local assignment." Engleman was performing his duties in Annapolis and Western had placed him on local assignment. Western could then, if it deemed it appropriate, furnish him transportation to the job location by assigning him to travel as driver or passenger in a company provided vehicle. ¶ 2.3. If it so assigned him as a driver he would

2. Veronica P. Garvey, a Department Chief in Labor Relations for Western testified before the Commission. She said:
"Each employee, when he is hired, is hired for a base location, but, when Baltimore needs men, they hire Baltimore people and they designate a base location for him as Baltimore."
3. Miss Garvey testified: "The accepted rule or guide for establishing computation points has been that in big cities, such as Baltimore, we would use what the Rand-McNally Highway Guide calls a key point, and that's usually the intersection in the downtown area of a national and State highway, or some other civic monument which is considered the center of town. It's a fictitious point as far as we're concerned; it's just a point set up for the purpose of computing distance."

be paid as authorized time worked for all time spent driving over a route specified by his supervisor. ¶ 3.2 (a). If it so assigned him as a passenger his travel time would be established by Western, based on the average elapsed time required for one-way travel between the designated starting point and the job location. "The amount of time by which such one-way travel [computed to the nearest five (5) minutes] exceeds forty-five (45) minutes shall be paid for in respect to each one-way trip." ¶ 3.2 (b). Western did not furnish Engleman's transportation in a company provided vehicle. It then could not specify the mode of travel to be used by him. ¶ 2.3. Engleman and another worker, Charles David Clarke, (at one time it was two other workers) "carpooled." They met at the Frankford Plaza Shopping Center and each alternated driving his car to Annapolis with the other as a passenger. This use of his private motor vehicle could "in no case be considered either as authorized or required" by Western. ¶ 2.4. However, each of them whether he drove his car or not on a particular day, received, in addition to his hourly wage, a "daily transportation expense allowance" and a "daily travel time allowance." These allowances were based on the distance within one-tenth of a mile from the computation point to the job location, that is to the front door of the building in which the work was being performed. A schedule of the daily transportation expense allowances in dollars and cents and the daily travel time allowances in minutes is set out in ¶ 3.1.

With respect to transportation expense no allowance is payable up to five miles. It is specified as 94 cents for 5 up to 6 miles. The amount increases 16 cents and 18 cents in turn as the distance increases. Thus the amount for 6 up to 7 miles is $1.10, an increase of 16 cents and the amount for 7 up to 8 miles is $1.28, an increase of 18 cents. It continues in like manner to a distance of 32 up to 33 miles for which the allowance is $5.52.[4] This

---

4. Apparently 33 miles was deemed the longest distance within the range of travel on a daily basis for a local assignment. Paragraph 1.7 defines "local assignment" as "the assignment of an

is at the rate of 17 cents a mile computed on the mid-point between the mileage figures. But since the mileage represents the distance from the computation point to the job location, that is, only one way, the amount allowed is at the rate of 8 and one-half cents per mile (after the first 5 miles) for the distance to work and for the distance from work, that is two ways.

With respect to travel time there is no allowance up to 18 miles. The time allowed for 18 up to 19 miles is 3 minutes and the allowance increases 3 minutes each mile to 32 up to 33 miles for which the allowance is 45 minutes.[5] The obvious correlation between the distance and the time period allowance is an average driving speed of 40 miles per hour, bearing in mind again that the schedule is predicated upon the distance only to the job site so that the mileage to and from the job site would be twice the distances in the schedule. Engleman was paid for the travel time allowed on the basis of his hourly rate. Paragraph 2.17 provides that when the authorized time worked at the employee's standard hourly rate plus compensated travel time for the workweek does not exceed 40 straight time hours, the travel time allowance is paid at the employee's standard hourly rate. When it does, the allowance for the excess is one and one-half times his standard hourly rate. But the contract gives Western the right when an employee is paid for travel time to reduce the daily work schedule up to the amount of such travel time by varying the starting and stopping time of his daily work schedule. ¶ 3.3. For the purpose of the travel allowances, Western selects the route and determines the road mileage measurement for that route. ¶ 2.18. The contract provides that the employee will be re-

---

Employee to a Job Location which the Company determines is within the range of travel on a daily basis from the applicable Computation Point of his Work Location."

5. These allowances are for certain cities designated in Appendix 3 of the contract as "List A Computation Points." Baltimore is included. For all other computation points travel time is not allowed for less than 23 miles. It then starts at 3 minutes for 23 up to 24 miles and increases 3 minutes a mile to 32 up to 33 miles for which the allowance is 30 minutes.

imbursed for toll fees reasonably related to travel to the job location as incurred, upon presentation of receipts. ¶ 2.19.

Thus it was that Engleman, whose base location was Baltimore City and who was on local assignment with a job location in Annapolis, was paid, in addition to his standard hourly rate, two amounts with respect to his travel from Baltimore to Annapolis, Western not fur-nishing him transportation: (1) a daily transportation expense allowance in an amount fixed by the contract for the mileage from Orleans and St. Paul Streets to the job location; and (2) a daily travel time allowance, the time period fixed by the contract on the same mileage basis and the compensation for the time allowed paid at his standard hourly rate for a 40 hour week and at one and one-half times that rate for time in excess of 40 hours.

We think that the only reasonable construction of contract CWA-11 is that Western was obliged to provide transportation for those persons it employed as installers with a Baltimore City base location and placed on local assignment. It had a choice of fulfilling this obligation by furnishing company provided vehicles or by paying designated allowances.[6] Western also recognized in the contract that "the character of the installation work makes it necessary for an Employee to move to and from his Job Locations." ¶ 2.1. Considering all the provisions of Art. 13 of the contract and particularly in the light of those by which Western agreed that it would endeavor to assign an employee to a job location as near his home

6. Miss Garvey said at the hearing:
"The only situations in which we would ordinarily use company provided vehicles are those where some special kind of thing is needed, like a Snow Cat, or where you can't take a bus or a car into secret government location. It's rather restricted use. * * * The use of furnishing transportation by the company is a very, very limited and occasional thing. * * * It would not apply to an Annapolis job. It would not apply; the Union would immediately file a grievance."
That Western for practical or economic reasons did not furnish transportation in company provided vehicles did not change the fact that they had the right to do so under their agreement.

location and as near his place of residence in the work location as conditions permit, ¶ 2.8; that it would not assign an employee to an outlying job location unless transportation or communication was available to him, ¶ 2.10; that it would select the route and determine the road mileage measurement therefor, ¶ 2.18; and that it would reimburse employees for toll fees in fact paid if reasonably related to the travel, ¶ 2.19, we find it inescapable that it agreed to furnish Engleman transportation to the job site.

The inquiry now turns to whether the allowances paid for travel by Western had a relation to the actual cost. We first observe that the subjective interpretation by a party is not the test.[7] *Tavel v. Bechtel Corporation, supra,* at 303. How Western considered the allowances and how Engleman considered them are not germane. It is correct that the allowances bore no direct relation to the distance Engleman actually travelled to and from the job location or the time he actually spent in getting there and back. He would have been paid the same amounts had he lived in Annapolis or Frederick. But this is not to say that the allowances bore no relation to the actual cost. We believe they did. When Engleman accepted the position with Western he did so with a base location of Baltimore City. Thus he to all intent and purpose agreed that while on local assignment he would accept as payment for the costs of his transportation to a job location, allowances based on the mileage from a fixed computation point in Baltimore City to the front door of the building in which he was to perform his duties. These allowances did in fact bear a relation to reasonable costs of travel from Baltimore City to Annapolis. They were based on actual distance and payment was made at the rate of 8 and one-half cents a mile (after the first 5 miles) plus payment at his on the job wages for time

7. Miss Garvey perferred to consider the allowances "a negotiated pattern or scheme, whatever you want to call it, for offering some economic inducement to take a job that has a mobility requirement as this one does. * * * This is a mobility allowance * * * for the inconvenience incurred. It's an economic recognition of the mobility requirement of this job."

which would be consumed on the trip at an average driving speed of 40 miles per hour (after the first 18 miles). We feel this was sufficient to bring the payments within the "free transportation" requirement of the *Watson* exception. We do not deem it necessary to invoke the exception that the payments for transportation be literally the actual costs thereof to the employee. Engleman was free by express agreement to select his mode of transportation and the route he would travel. But if he preferred to travel to Annapolis from Baltimore by way of Washington it would not be reasonable for Western to be obliged to pay his actual expenses to bring him within the exception. Nor does the "actual costs" element mean that he would have to be entitled to a larger amount by driving a car which consumed a gallon of gas every 10 miles than if he drove a car that got 20 miles to the gallon. And he could, if he desired, travel to his job location by plane or boat, but to hold that if he did Western would have to pay the "actual" costs thereof to have the exception apply would be patently absurd. In fact Engleman travelled to and from his home to the job location in Annapolis by way of the Frankford Plaza Shopping Center where he "carpooled" with his fellow worker, Clarke. One day Engleman would drive his car with Clarke as a passenger and the next day Clarke would drive his car with Engleman as a passenger. The mode of transportation was at his option under the contract.[8]

---

8. We note what the Court said in *Watson v. Grimm, supra*, at 469: "We have stated that where an employer provides free transportation for his employee, the employee is deemed to be on duty during transportation, whether the employer supplies the vehicle or compensates the employee for the use of his own. * * * It is held by the overwhelming weight of authority that where the employer agrees to provide transportation for his employee to and from work, compensability of injury sustained during transportation is in no way dependent upon the method of travel employed." It continued, citing *Cardillo v. Liberty Mutual Insurance Co.*, 330 U. S. 469, with approval: "[W]here there is an obligation to furnish the transportation, it is irrelevant whether the employer performs the obligation by supplying its own vehicle, hiring the vehicle of an independent contractor, making arrangements with a common carrier, reimbursing employees for the use of their own vehicles, or reimbursing employees for the cost of transportation by any means they desire to use."

That it may have cost him more or less than Western allowed was immaterial for Western did in fact, under an agreement to provide transportation, make payments which bore a relation to reasonable travel expenses. It is in this respect that we deem *Tavel v. Bechtel Corporation, supra,* factually inapposite. In *Tavel* there was no agreement to pay the costs of transportation and the amount paid had no relation to the actual cost.[9] 242 Md. at 305.

On the undisputed facts and inferences properly drawn from them we find, as a matter of law, that Engleman's injuries did arise out of and in the course of his employment. In so finding we point out that cases dealing with the "coming and going" rule and modifications thereof must be determined upon their own facts. *Maryland Paper Products Co. v. Judson,* 215 Md. 577, 583-589. And we have kept in mind "both the legislative mandate that the Workmen's Compensation Act shall be so interpreted and construed as to effectuate its general social purpose and the concomitant consideration that workmen, like other members of the general public, are not insured against the common perils of life." *Tavel v. Bechtel Corporation, supra,* at 303; Code, Art. 101, § 63.

> *Judgment affirmed; costs to be paid by appellant.*

---

9. The payments in *Tavel* had started under an agreement between Bechtel and the union but at the time of Tavel's injury that agreement had terminated and there was no provision for the zone rate payments in the new agreement. Nevertheless Bechtel continued to make the payments, although it was not obliged to do so.